Filed 10/13/22  P. v. Gonzales CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078349 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB056461-3) |
| SOLINA SANDRA GONZALES, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Bernardino County, Michael A. Smith, Judge.  Reversed.

Edward Mahler, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Daniel B. Rogers, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Solina Sandra Gonzales appeals from an order summarily denying her petition for resentencing filed pursuant to

Penal Code section 1170.95 (now § 1172.6).[1]  She contends that her petition established a prima facie claim for relief requiring the trial court to issue an order to show cause.  She also argues that the trial court erred in finding that Senate Bill No. 1437 (SB 1437) is unconstitutional.  Finally, Gonzales requests that on remand, pursuant to Code of Civil Procedure section 170.1, subdivision (c), further proceedings on her petition for resentencing be conducted before a judicial officer other than the one who summarily denied her petition.  The People concede that the trial court erred in denying Gonzales's petition based on the court's mistaken recollection of the jury instructions that were given at her trial regarding the robbery-murder and kidnapping-murder special circumstances, and on the court's erroneous understanding of the significance of the jury's finding that Gonzales personally used a knife and committed torture.  The People also concede that SB 1437 is not unconstitutional, and that the matter should be remanded to the trial court with directions to issue an order to show cause and hold an evidentiary hearing.  However, the People maintain that there is no basis to disqualify the trial judge on remand.  We accept the People's concessions and remand the case with directions for the trial court to issue an order to show cause.  We conclude that an order that proceedings on remand be conducted before a different judicial officer is not warranted.

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.  Effective June 30, 2022, section 1170.95 was recodified without substantive change in section 1172.6, pursuant to Assembly Bill No. 200 (2021-2022 Reg. Sess.).  (See Stats. 2022, ch. 58, § 10.)  We refer to the subject statute by its current codification throughout this opinion.

FACTUAL AND PROCEDURAL BACKGROUND

A. Underlying Facts

The following underlying facts about the murder are taken from this court's unpublished opinion in *People v. Pineda* (Apr. 5, 2012, D057185) [nonpub. opn.].

> "On the night of June 7, 2006, [A.J.], [J.P.] and [N.M.] drove to a San Bernardino night club in [A.J.]'s Chrysler 300. The three were sitting in the car deciding whether to go inside the club when Gonzales approached the car and began talking with the men. Gonzales asked the men if they wanted to 'hang out.'
>
> "Gonzales waited for some of her friends to come out of the club, and then told the men to follow her blue Suburban. The other women who joined Gonzales were Linda Caballero and Desiree Cardenas.
>
> "The men followed the women to an apartment complex that was approximately a mile away from the club. The women escorted the three men to Jeannette Rios's apartment, where the men sat on one couch, and Caballero and Cardenas sat on a couch across from the men. Gonzales alternatively stood and sat while talking with the others. While [A.J.], [J.P.] and [N.M.] talked with Gonzales, Caballero and Cardenas, Rios was moving from room to room. At one point, Rios told everyone that they had to 'keep it down' because her kids were asleep in the apartment.
>
> "After a few minutes, Gonzales got up and went into a bedroom with Rios. They were in the bedroom for about 10 to 15 minutes. Shortly after Gonzales and Rios emerged from the bedroom, they returned to the bedroom, taking a telephone with them.
>
> "At some point, Gonzales returned to the living room and asked the men if they wanted to buy some beer. Rios walked back and forth to a window and kept looking out

3

through the blinds. Gonzales left the apartment. Rios then went into the bathroom. Caballero went to the bathroom door and saw Rios with a spoon and syringe. Caballero believed that Rios was 'doing some kind of drugs.'

"Caballero asked Rios for a cigarette. Rios told Caballero to ask one of the men to take her to the store, and then told Caballero that she, Rios, was going to take the man's car. Caballeros 'looked at her like [she was] crazy' and walked away.

"About five to 10 minutes after Gonzales left to buy beer, Rios used the telephone. At some point during this time, Rios told [J.P.], in an aggressive tone, that she did not like the black and red baseball cap that he was wearing.

"Gonzales returned about 20 minutes after she had left the apartment. She was carrying a pocketknife and did not have any beer. [Johnny] Montano and [Joseph Peter] Pineda followed Gonzales into the apartment. Montano and Pineda shook hands with the three men. Montano then pulled out a black nine-millimeter semiautomatic handgun, placed it next to [J.P.]'s head, and asked [J.P.] whether 'he liked it.' Pineda pulled out a revolver.

"Either Gonzales or Rios told Caballero and Cardenas to leave, and the two women left the apartment.

"One of the remaining women told [A.J.], [J.P.] and [N.M.] to '[t]ake off all [their] shit and hand over the car keys.' [A.J.] gave the car keys to Montano. Someone ordered [A.J.] to turn around and put his hands on the back of the couch. Montano grabbed [J.P.] by the shirt and forced him to the floor. Pineda ordered [N.M.] to get on the floor, and [N.M.] complied.

"Gonzales began removing [A.J.]'s clothing and belongings, and cut a gold bracelet off of his wrist using her pocketknife. Montano removed [J.P.]'s clothing and belongings. Pineda did the same to [N.M.]. Gonzales collected all three men's wallets and cell phones.

4

"Pineda put his gun to [N.M.]'s back and escorted [N.M.] out of the apartment to the curb where [A.J.]'s car was parked and ordered him to sit. Gonzales, meanwhile, had a discussion with Montano about handcuffs. Pineda walked back to the apartment, leaving [N.M.] outside. Pineda then placed a gun to the back of [A.J.]'s head and escorted [A.J.] to the curb to join [N.M.].

"Montano later emerged from the apartment with [J.P.], whose hands were bound behind his back. Pineda followed soon after, with his gun in his hand. Gonzales and Rios then walked out of the apartment, carrying the men's shoes and clothing, and went to the blue Suburban.

"Although Montano had originally indicated that he was going to take [A.J.] with him, at some point Gonzales said that she did not like [J.P.] and suggested that they take him instead of [A.J.]. Someone then led [J.P.] to [A.J.]'s car and placed him in the back seat.

"After [J.P.] was placed in the car, Montano pointed his gun at [A.J.] and [N.M.] and told them to stand up and look down the street. Montano then told the two men to 'start running before he killed' them. The men ran away. [A.J.] looked back and saw Gonzales and Rios get into the Suburban. [N.M.] saw Montano get into the Chrysler, where [J.P.] was sitting. As [A.J.] turned a corner, he saw the Suburban drive away, with his Chrysler following close behind.

"Police later found [A.J.]'s Chrysler abandoned in an alley in San Bernardino. Police found bloodstains that contained [J.P.]'s DNA on the front passenger seat, the rear seat, and the interior door frame of the passenger side rear door of the vehicle. A bloodstain on the rear seat of the Chrysler was found to contain the DNA of both [J.P.] and another individual, possibly Pineda.

"Police also found [J.P.]'s DNA in bloodstains in the Suburban, including in stains on the door frame of the driver's side rear door, the backrest of the passenger side

front seat, and the shoulder belt on the passenger side middle seat. In addition, [J.P.]'s DNA was found in bloodstains on Montano's jeans, on Pineda's shorts, on the barrel and grip of a handgun, and on a folding knife.

"Police recovered [J.P.]'s body in another alley in San Bernardino. [J.P.]'s head was wrapped in a blood-soaked t-shirt. He had been shot three times in the face. At least one of the shots appeared to have been fired at close range. A strip of dark colored fabric was wrapped around [J.P.]'s neck. A ligature mark on his neck and petechial hemorrhages in the conjunctiva of both of [J.P.]'s eyes indicated that he had been strangled. [J.P.] had suffered 10 stab wounds to the head and back. Handcuffs were secured on [J.P.]'s right wrist, and a piece of green cloth was tied around his left arm. A hemorrhage on the left arm was consistent with a needle puncture, which could be consistent with an injection of methamphetamine.

"[J.P.]'s body also revealed multiple contusions on the torso and soles of his feet that were consistent with his having been struck with a long cylindrical object. Abrasions on [J.P.]'s body were consistent with his body having been dragged, and black marks on the body were consistent with him having been run over by a vehicle.

"Toxicology tests on [J.P.]'s body indicated that he had methamphetamine in his system, but no alcohol. The autopsy determined that [J.P.] died as a result of 'gunshot wounds of [*sic*] head with strangulation, with stab wounds of chest.'

"Police officers served a search warrant at an apartment in San Bernardino in connection with this case on June 8, 2006. Police found a purse in a dresser in the master bedroom that contained a loaded pistol magazine and an identification card with Gonzales's name and photograph. There was a handcuff key sitting next to the purse. Police also found a revolver hidden under a bag, which was under a nightstand in the room. The revolver contained two live rounds of ammunition and three spent shell casings. The

6

bullets recovered from [J.P.]'s body had fragmented, but they nevertheless appeared consistent with the live rounds that were recovered from the revolver. Police also found Gonzales's folding knife, which she apparently routinely carried concealed in her bra, and [N.M.]'s cell phone, in a closet in the master bedroom.

"Police made contact with Montano, Pineda and Gonzales that day at the apartment. An officer conducted a custodial search of Pineda and found a wallet and cell phone in his right front pocket. At trial, [J.P.]'s mother identified the cell phone found on Pineda as belonging to [J.P.].

"The following day, police found Gonzales's blue Suburban at another residence. Gonzales's stepfather and his friend were inside the vehicle when police arrived. The carpet in the vehicle was completely soaked, and a garden hose was running at high pressure on the ground nearby. Gonzales's stepfather was arrested. During an interview with police, he admitted that Gonzales had asked him to take the Suburban because 'it was hot.'

"Police also executed a search warrant at Rios's apartment. During the search of her apartment, police found a substance that they believed to be methamphetamine, as well as paperwork addressed to Rios. In the bathroom, police found a scale of the size that is often used to measure small quantities of drugs. The scale had white powdery residue on it."

### B. The Charges

In 2009, Gonzales, Pineda, Montano, and Rios were charged by amended information with murder (count one) (§ 187, subd. (a)), three counts of robbery (counts two, three, and four) (§ 211), three counts of carjacking (counts five, six, and seven) (§ 215, subd. (a)), one count of kidnapping to commit robbery (count eight) (§ 209, subd. (b)(1)), and one count of torture (count nine) (§ 206). The information alleged special circumstances that

7

Gonzalez, Pineda, Montano, and Rios committed the murder during the commission of robbery and a kidnapping (§ 190.2, subd. (a)(17)).

The information further alleged an enhancement that Gonzales used a deadly weapon, a knife, during the commission of each of the offenses (§ 12022, subd. (b)(1)).[2] The information also alleged an enhancement that each of Gonzales's offenses was a sexually violent offense (§ 667.5, subd. (b)). Additionally, the information alleged an enhancement that Gonzales committed robbery in an inhabited dwelling while voluntarily acting in concert with two or more accomplices (§ 213, subd. (a)(1)(A)). Finally, the information alleged an enhancement that Gonzales used a firearm during the commission of torture (§ 12022.53, subd. (b)).

### C. Jury Instructions Given Regarding Felony Murder and Special Circumstances of Murder During the Commission of Robbery and Kidnapping

The only theory of murder on which the jury was instructed was felony murder. The court gave the following instruction on felony murder:

> "Each defendant is charged in Count 1 with murder, under a theory of felony murder.
>
> "A defendant may be guilty of murder, under a theory of felony murder, even if another person did the act that resulted in the death, I will call the other person the *perpetrator*.
>
> "To prove that a defendant is guilty of first degree murder under this theory, the People must prove that:
>
> "1. The defendant committed or aided and abetted the crime of robbery, carjacking, or kidnapping, Or

---

2    The information also alleged enhancements as to the other three defendants, which are not relevant for our analysis.

8

"2.  The defendant intended to commit or intended to aid and abet the perpetrator in committing the crime of robbery, carjacking, or kidnapping.

"3.  If the defendant did not personally commit the crimes of robbery, carjacking, kidnapping, then a perpetrator, whom the defendant was aiding and abetting personally committed the crime of robbery, carjacking, or kidnapping,

"[AND]

"4.  While committing robbery, carjacking or kidnapping, the perpetrator did an act that caused the death of another person

"AND

"5.  There was a logical connection between the act causing the death and the robbery, carjacking, or kidnapping.

"The connection between the fatal act and the robbery, carjacking, or kidnapping must involve more than just their occurrence at the same time and place.

"A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent.

"To decide whether any defendant committed robbery, carjacking, or kidnapping, please refer to the separate instructions that I will give/have given you on those crimes. To decide whether any defendant aided and abetted a crime, please refer to the separate instructions that I will give/have given you on aiding and abetting.  You must apply those instructions when you decide whether the People have proved first degree murder under a theory of felony murder.

9

"The defendant must have intended to commit or to aid and abet the felonies of robbery, carjacking, or kidnapping before or at the time of the act causing the death.

"It is not required that the person die immediately, as long as the act causing the death and the felonies are part of one continuous transaction.

"It is not required that the defendant be present when the act causing the death occurs."

The court gave the following instruction on the special circumstances of murder during the commission of robbery and kidnapping:

"Each defendant is charged with the special circumstance of:

"1. Murder committed while engaged in the commission of robbery; AND

"2. Murder committed while engaged in the commission of kidnapping in violation of Penal Code section 190.2(a)(17).

"To prove that these special circumstances are true, the People must prove that:

"1. The defendant committed or aided and abetted the crime of robbery and kidnapping;

"2. The defendant intended to commit or intended to aid and abet the perpetrator in committing robbery and kidnapping;

"3. If the defendant did not personally commit robbery and kidnapping, then a perpetrator, whom the defendant was aiding and abetting before or during the killing, personally committed the crime of robbery and kidnapping;

10

"4. A defendant did an act that caused the death of another person; AND

"5. The act causing the death and the robbery and kidnapping were part of one continuous transaction; AND

"6. There was a logical connection between the act causing the death and the robbery and the kidnapping.

"The connection between the fatal act and the robbery and kidnapping must involve more than just their occurrence at the same time and place.

"To decide whether a defendant committed robbery or kidnapping, please refer to the separate instructions that I (will give/have given) you on that crime.

"To decide whether a defendant aided and abetted a robbery or kidnapping please refer to the separate instructions that I (will give/have given) you on aiding and abetting.

"You must apply those instructions when you decide whether the People have proved these special circumstance allegations.

"A defendant must have intended to commit or aided and abetted the kidnapping and robbery before or at the time of the act causing the death.

"In addition, in order for these special circumstances to be true, the People must prove that the defendant intended to commit robbery and kidnapping independent of the killing. If you find that the defendant only intended to commit murder and the commission of robbery and kidnapping was merely part of or incidental to the commission of that murder, then the special circumstance has not been proved.

"An act causes death if the death is direct, natural, and probable consequence of the act and the death would not

11

have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.

"There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death."

The court gave the following instruction regarding use of deadly or dangerous weapon:

"Someone *personally uses* a deadly or dangerous weapon if he or she intentionally does any of the following:

"1. Displays the weapon in a menacing manner,
OR

"2. Hits someone with the weapon
OR

"3. Fires the weapon."

The court gave the following instruction regarding torture:

"Each defendant is charged in Count 9 with torture.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant inflicted great bodily injury on someone else;

"AND

"2. When inflicting the injury, the defendant intended to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose.

12

"*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"It is not required that a victim actually suffer pain.

"Someone acts for the purpose of *extortion* if he or she intends to (1) obtain a person's property with the person's consent and (2) obtain the person's consent through the use of force or fear.

"Someone acts with a *sadistic purpose* if he or she intends to inflict pain on someone else in order to experience pleasure himself or herself."

D. Conviction and Sentence

In August 2009, a jury found Gonzales, Pineda, and Montano guilty of one count of murder (count one) (§ 187, subd. (a)); three counts of robbery (counts two, three, and four) (§ 211); three counts of carjacking (counts five, six, and seven) (§ 215, subd. (a)); one count of kidnapping to commit robbery (count eight) (§ 209, subd. (b)(1)); and one count of torture (count nine) (§ 206).[3] The jury found true the special circumstance allegations that Gonzales, Pineda, and Montano committed the murder during the commissions of robbery and kidnapping (§ 190.2, subd. (a)(17)).

The jury also found true the enhancement allegations that Gonzales personally used a knife during the commission of the offenses (§ 12022, subd. (b)(1)); and that Gonzales committed robbery in an inhabited dwelling while voluntarily acting in concert with two or more accomplices (§ 213, subd. (a)(1)(A)).

---

[3] The jury found Rios not guilty of all the charges against her.

13

The trial court found that Gonzales had served two prior prison terms (§ 667.5, subd. (b)). The court sentenced Gonzales to life in prison without the possibility of parole, plus life with an additional 12 years.

A panel of this court affirmed Gonzales's convictions and sentences in *People v. Pineda* (Apr. 5, 2012, D057185) [nonpub. opn.].

## E. Petition for Resentencing

In February 2019, Gonzales petitioned for resentencing under former section 1170.95, now section 1172.6. In her petition, Gonzales alleged (1) that "[a] complaint, information, or indictment was filed against [her] that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine"; (2) that she "was convicted of 1st or 2nd degree murder pursuant to the felony murder rule or the natural and probable consequences doctrine"; and (3) that she "could not now be convicted of 1st or 2nd degree murder because of changes made to Penal Code §§ 188 and 189, effective January 1, 2019."[4]

The People moved to strike Gonzales's petition on the sole basis that SB 1437, which amended sections 188 and 189, is unconstitutional.

In its written ruling filed on November 4, 2019, the trial court first assumed that SB 1437 is valid and constitutional, and acknowledged that SB 1437:

> ". . . amended Penal Code § 189, adding section (e), which provides a person can only be liable for a death which occurs during the commission of a felony if:
>
> "1) The person is the actual killer; OR

---

4     These allegations are made through a form petition in which Gonzales check-marked boxes next to these statements.

14

"2) The Person had the specific intent to kill AND acted, induced, solicited, requested the actual killer to commit the underlying Felony; OR

"3) The person was a major participant in the underlying Felony AND aided with reckless indifference to human life."

The trial court concluded that the fact that the jury found that Gonzales personally used a deadly weapon—a knife—and the fact that Gonzales was convicted of torture of [J.P.] "clearly demonstrates" that Gonzalez was an "active participant[ ] in the actual killing of [J.P.], and [was] acting with the specific intent to kill."

The court also mistakenly stated that the jury was instructed that in order to find the special circumstance of murder during the commission of robbery true:

". . . for a Defendant who is not the actual killer, but who is guilty of first degree murder as an aider and abettor of the robbery, the *People must prove either that the Defendant intended to kill*, or the People must prove all of the following:

"(1) The Defendant's participation in the robbery began before or during the killing;

"(2) The Defendant was a *major participant* in the robbery; AND

"(3) When the Defendant participated in the crime, he *acted with reckless indifference to human life*.

"A person acts with reckless indifference to human life when he knowingly engages in criminal activity that he knows involves a grave risk of death.

"If the Defendant was not the actual killer, then the People have the burden of proving beyond a reasonable

15

doubt that he acted with either *the intent to kill* or with *reckless indifference to human life* and was a *major participant* in the crime for the special circumstance of murder during the commission of a robbery to be true. fi[sic] the People have not met this burden, you must find this special circumstance has not been proved true [f]or that Defendant." (Italics added.)

While the court did not identify it as such, the quoted language above regarding the special circumstance of murder during the commission of robbery is from CALCRIM No. 703.

The court also mistakenly stated that the jury was instructed that in order to find the special circumstance of murder during the commission of kidnapping, the following must be proven:

"1. The Defendant committed or aided and abetted kidnapping;

"2. The Defendant intended to commit or intended to aid and abet the perpetrator in committing kidnapping.

"3. If the Defendant did not personally commit kidnapping, then another perpetrator, whom the Defendant was aiding and abetting, personally committed kidnapping.

"4. The Defendant did an act that was a substantial factor in causing the death of another person;

"AND

"5. The Defendant *intended that the other person be killed. (acted with intent to kill)*" (Italics added.)

The trial court concluded that "[c]learly, by finding the special circumstances true, finding personal use of a . . . deadly weapon true, and by finding Gonzales . . . guilty of torture, all of the requirements of PC 189 as

16

enacted by SB 1437 were found true by [*sic*] a reasonable doubt." Thus, the court ruled that Gonzales was ineligible for relief under section 1172.6.

The trial court also concluded that SB 1437 unconstitutionally amended Proposition 7 (Prop. 7, as approved by voters, Gen. Elec. (Nov. 7, 1978)) without voter approval, and Proposition 115 (Prop. 115, as approved by voters, Primary Elec. (June 5, 1990)) without a vote in favor by two-thirds of both houses of the Legislature.

This court granted Gonzales's motion for late filing of a notice of appeal from the trial court's November 4, 2019 order, and Gonzales filed her notice of appeal on August 19, 2021.

DISCUSSION

Gonzales contends that the trial court erred in summarily denying her petition for resentencing because she made a prima facie showing that she is entitled to relief, requiring that the trial court issue an order to show cause. She also contends that the trial court erred in finding that SB 1437 unconstitutionally amended Propositions 7 and 115. The People concede these issues. Gonzales requests that upon remand, further proceedings on her petition for resentencing be conducted before a judicial officer other than the judge who summarily denied her petition. The People maintain that there is no basis to disqualify the trial judge on remand.

A. SB 1437 Did Not Unconstitutionally Amend Propositions 7 and 115

Gonzales argues, and the People concede, that the trial court erred in concluding that SB 1437 unconstitutionally amended Propositions 7 and 115.

In *People v. Lamoureux* (2019) 42 Cal.App.5th 241, this court held that SB 1437 did not unconstitutionally amend Proposition 7 or Proposition 115. (*Id.* at p. 246.) Relying on our analysis in *Lamoureux*, which we incorporate

17

here, we conclude that trial court erred in determining that SB 1437 is unconstitutional.

B. Gonzales Is Entitled to the Issuance of an Order to Show Cause

The People concede that Gonzales alleged facts sufficient to state a prima facie case of eligibility under section 1172.6 and that an order to show cause should issue because the record of conviction does not show that Gonzales is ineligible as a matter of law. Specifically, the People concede that the fact that the jury found true the section 12022, subdivision (b)(1) allegation that Gonzales personally used a knife and that she committed torture does not establish, at the prima facie stage, that Gonzales actively participated in the actual killing and acted with the specific intent to kill. Additionally, the People concede that the trial court erred in relying on its mistaken recollection of the jury instructions that were given at trial regarding the robbery-murder and kidnapping-murder special circumstances. In fact, CALCRIM No. 703 was not given as to the robbery-murder special circumstance, and the jury was not instructed that it was required to find that Gonzales acted with an intent to kill as to the kidnapping-murder special circumstance. As the People concede, because nothing in the jury instructions actually given required the jury to find that a defendant who is not an actual killer either acted with the intent to kill or was a major participant in the underlying felony and acted with reckless indifference to life, the special circumstances findings do not establish that Gonzales was ineligible for relief under section 1172.6 without resort to additional factfinding that is not permissible at the prima facie stage.

1. Relevant Legal Standards

SB 1437, enacted in 2018, sought "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to

18

ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) The bill amended section 188, which defines malice, and section 189, which defines the degrees of murder, in order to address felony murder liability. (Stats. 2018, ch. 1015, § 2–3.)

SB 1437 redefined malice under section 188 to require that a principal in an offense in which a murder occurs have acted with malice aforethought. Currently, section 188, subdivision (a)(3) provides in relevant part: "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." Section 189 was amended to include new subdivision (e), which provides: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer[;] [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree[; or] [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (Stats. 2018, ch. 1015, § 3.)

SB 1437 also added a new section, now section 1172.6, which provides a procedure by which those who have been convicted of murder can seek retroactive relief. (Stats. 2018, ch. 1015, § 4.) Section 1172.6, subdivision (a) allows a person convicted of felony murder to bring a petition for resentencing if the person could not be convicted of murder after the changes

19

to section 188 and 189 enacted by SB 1437.  When presented with a petition seeking relief under section 1172.6, the trial court must first determine whether the petitioner has made a prima facie case for relief.  (§ 1172.6, subd. (c).)

The court may rely on the record of conviction in determining whether a prima facie showing has been made.  (*People v. Lewis* (2021) 11 Cal.5th 952, 971 (*Lewis*).)  However, "[w]hile the trial court may look at the record of conviction . . . to determine whether a petitioner has made a prima facie case for section [1172.6] relief, the prima facie inquiry under subdivision (c) is limited."  (*Ibid.*)  "In reviewing any part of the record of conviction at this preliminary juncture, *a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.'* "  (*Id.* at p. 972, italics added; *People v. Drayton* (2020) 47 Cal.App.5th 965, 980 (*Drayton*).)  "Like the analogous prima facie inquiry in habeas corpus proceedings, ' "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved.  If so, the court must issue an order to show cause." ' "  (*Lewis, supra*, at p. 971; *Drayton, supra*, at p. 978.)

Once the trial court issues an order to show cause, it must then conduct an evidentiary hearing pursuant to the procedures and burden of proof set out in section 1172.6, subdivision (d) unless the parties waive the hearing or the petitioner's entitlement to relief is established as a matter of law by the record.  (§ 1172.6, subd. (d)(2); *Drayton, supra*, 47 Cal.App.5th at pp. 980–981.)

Although a court should not reject a petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing (*Lewis, supra*, 11 Cal.5th at p. 971), the court need not credit factual assertions that

20

are untrue as a matter of law (*Drayton, supra*, 47 Cal.App.5th at p. 980). Thus, " 'if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Lewis, supra*, at p. 971.)

  2. Analysis

  The People concede that the allegations and record of conviction in this case do not establish, as a matter of law, that Gonzales is not entitled to relief under section 1172.6. We agree and accept the concession. Thus, the trial court should have issued an order to show cause.

  Rather than issuing an order to show cause, the trial court engaged in prohibited fact finding. According to the trial court, the fact that the jury found that Gonzales personally used a knife and committed torture demonstrated that she actively participated in the actual killing of J.P. and acted with the specific intent to kill. However, the jury was instructed that the personal use of a deadly weapon allegation could be based on simply displaying the weapon in a menacing manner. Nothing in the record of conviction, including the verdict forms, indicates whether the jury found this allegation true as to the murder offense (or any other offense) based on Gonzales displaying the knife in a menacing manner or instead, actually making contact with someone with the knife. With respect to the torture conviction, this court noted in our previous opinion that separate punishments for both murder and torture were not precluded under section 654, because the trial court found that " 'the torture was separate and apart from the actual homicide.' " (*People v. Pineda* (Apr. 5, 2012, D057185) [nonpub. opn.]). Thus, the fact that Gonzales was convicted of torture does

21

not establish that she was an active participant in the actual killing of J.P. or that she acted with the intent to kill.

The court also erred in denying Gonzales's petition based on its mistaken recollection of the instructions that were given to the jury at trial. The court mistakenly thought that the jury had been instructed that to find true the special circumstance of murder during the commission of a robbery, it had to find that Gonzales was a major participant in the robbery and acted with reckless indifference to human life, or acted with the intent to kill. The court also mistakenly thought that the jury had been instructed that to find true the special circumstances of murder during the commission of kidnapping, it had to find that Gonzales did an act that was a substantial factor in causing death and acted with intent to kill. In fact, the jury was not provided with these instructions. Moreover, no instruction given at trial required the jury to find that Gonzales aided and abetted the actual killer with the intent to kill, or that she was a major participant in the robbery or kidnapping and acted with reckless indifference to life, as required to find Gonzales guilty of felony murder under the amended section 189.

Because the record of conviction does not establish that Gonzales is ineligible for relief under section 1172.6 as a matter of law, we reverse the trial court's order denying Gonzales's petition and remand the matter with directions to the trial court to issue an order to show cause.

## C. Disqualification

Gonzales requests that we remand this matter to a judicial officer other than the one whose order is the subject of this appeal, under Code of Civil Procedure, section 170.1, subdivision (c). We conclude that disqualification is not warranted.

"At the request of a party or on its own motion an appellate court shall consider whether in the interests of justice it should direct that further proceedings be heard before a trial judge other than the judge whose judgment or order was reviewed by the appellate court." (Code Civ. Proc., § 170.1, subd. (c).) This power should be used sparingly, such as where a judge acts in a manner indicating "an animus inconsistent with judicial objectivity" or a "whimsical disregard" of the law. (*People v. Gulbrandsen* (1989) 209 Cal.App.3d 1547, 1562.) It would also be appropriate in circumstances necessary to avoid an appearance of unfairness to an appellant. (*People v. Swanson* (1983) 140 Cal.App.3d 571, 574.)

Gonzales contends that disqualification of Judge Michael A. Smith is warranted because he denied Gonzales's petition based on his mistaken recollection of the jury instructions that were given. She emphasizes that Judge Smith was the trial judge, he knew which instructions he gave, he signed the written jury instructions, and he had access to the written instructions during the petition proceedings. According to Gonzales, "[t]o make up claims about instructions which were never given . . . is the rare 'whimsical disregard' for the law which section 170.1(c) contemplates."

While Judge Smith certainly should not have relied on his own recollection of the jury instructions given in the case, we disagree that Judge Smith "made up" the jury instructions or that he showed a disregard for the law. Rather, he was mistaken—though rather carelessly so. A trial court must examine the actual record and not attempt to rely on its own recollection of the trial. However, we see no reason to believe that Judge Smith will not proceed impartially on remand and we therefore conclude that disqualification is not warranted.

23

## DISPOSITION

The trial court's order denying Gonzales's section 1172.6 petition is reversed and the matter is remanded with directions for the trial court to issue an order to show cause.

AARON, J.

WE CONCUR:

HUFFMAN, Acting P. J.

O'ROURKE, J.